In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00319-CR
NO. 09-17-00320-CR
_____

**JAMES RAY HAGGARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 75th District Court
Liberty County, Texas
Trial Cause No. CR30744 (Counts 1 and 2)**

**MEMORANDUM OPINION**

A jury found James Ray Haggard (Haggard or Appellant) guilty of one count

of sexual assault of a child and one count of indecency with a child by contact. *See*

Tex. Penal Code Ann. §§ 21.11, 22.011(a)(2) (West 2019).[1] Haggard pleaded "true"

---

[1] We cite current versions of the statutes because subsequent amendments do
not affect our disposition.

1

to enhancement paragraphs in the indictment alleging prior felony convictions, and the trial court sentenced Haggard to twenty-five years of confinement in each count, with the sentences to be served consecutively. Raising seven issues, Haggard appeals.

Background and Evidence at Trial

A grand jury indicted Haggard for the offenses of sexual assault of a child and indecency with a child, and the indictment alleged that on or about October 5, 2013, Haggard

COUNT I

. . . intentionally or knowingly cause[d] the sexual organ of [M.W.][2] to contact or penetrate the mouth of the defendant, without the consent of [M.W.], a child younger than 17 years of age and not the spouse of the defendant,
and/or
then and there, intentionally or knowingly cause[d] the sexual organ of [M.W.] to contact or penetrate the sexual organ of the defendant, without the consent of [M.W.], a child younger than 17 years of age and not the spouse of the defendant,
and/or
then and there, intentionally or knowingly cause[d] the penetration of the sexual organ of [M.W.] by defendant's finger, without the consent of [M.W.], a child younger than 17 years of age and not the spouse of the defendant,
and/or

---

[2] We refer to the victim, family members, and some others with initials or aliases. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

then and there, intentionally or knowingly cause[d] the penetration of the sexual organ of [M.W.] by defendant's sexual organ, without the consent of [M.W.], a child younger than 17 years of age and not the spouse of the defendant[.]

## COUNT II

. . . with the intent to arouse or gratify the sexual desire of said defendant, engage[d] in sexual contact with [M.W.] by touching the breast of [M.W.], a child younger than 17 years of age and not the spouse of the defendant,
and/or
then and there, with the intent to arouse or gratify the sexual desire of said defendant, engage[d] in sexual contact with [M.W.] by touching the genitals of [M.W.], a child younger than 17 years of age and not the spouse of the defendant,
and/or
then and there, with the intent to arouse or gratify the sexual desire of said defendant, cause[d] [M.W.], a child younger than 17 years of age and not the spouse of the defendant, to engage in sexual contact by causing the said [M.W.] to touch the genitals of the defendant,
and/or
then and there, with the intent to arouse or gratify the sexual desire of the defendant, cause[d] [M.W.], a child younger than 17 years of age and not the spouse of the defendant, to expose her genitals[.]

M.W. testified that she referred to Haggard as "Uncle James," that he is related to her but not her uncle. According to M.W., she was close with him and spent a lot of time at his house. M.W. testified that her family has been divided since October 5, 2013, due to Haggard's assault against her. M.W. testified that on October 5, 2013, when she was fifteen years old, she got in Haggard's bed with him because she did not want to sleep on the floor, he showed her pornography, he asked her to take her

3

clothes off, he caused her sexual organ to contact or penetrate his mouth, he contacted or penetrated her sexual organ without her consent, he penetrated her sex organ with his finger, he caused her to contact his sex organ, he touched her breast with a part of his body, he touched her genitals with a part of his body, he caused her to touch his genitals, and he caused her to expose her genitals to him. M.W. testified that Haggard's actions were done to make him sexually aroused. According to M.W., he stopped when he thought he heard someone approaching the bedroom and he told M.W. to put her clothes on. M.W. testified that she texted her friend that night and called her boyfriend that next morning and told them what had happened.

The morning after the assault, while Haggard was at the doughnut shop, M.W. called her mother crying and asked her mother to pick her up. M.W. testified that about an hour later her aunt picked her and her sister up. M.W. testified that on the way home she and her aunt discussed what took place to some extent. According to M.W., at some point her father arrived at the house, but she only gave an account of what happened to her mother and her aunt. M.W. testified that her mother bagged up her clothes when she changed clothes. M.W. testified that on the following Monday she went to the hospital for a sexual assault exam and answered questions asked by the nurse performing the exam and completing a report. M.W. testified that she also recalled being interviewed at Bridgehaven on October 15, 2013.

4

T.W., M.W.'s mother, testified that Haggard is her cousin and that she has known Haggard her entire life. According to T.W., on October 5, 2013, her children had been "hanging out with [Haggard's] kids" at Haggard's house as they typically would. T.W. testified that she left around 8 p.m. and two of her children, A.W. and M.W., stayed the night at Haggard's house. T.W. testified that around 8:30 a.m. the following morning she received a phone call from M.W. and she sounded distressed. After they spoke, T.W. "took a minute to kind of grasp . . . what [M.W.] had told [her,] and then T.W. called L.B., her brother's ex-wife and one of her closest friends, to ride with her to pick M.W. up. T.W. testified that because M.W. kept calling distressed and asking her to hurry up, she had L.B. pick her up instead because L.B. lived closer and L.B. could get there faster.

According to T.W., L.B. brought M.W. back to T.W.'s house and M.W. relayed to them what had happened at Haggard's house. T.W. explained that she walked in and out of the room because she did not want to hear the details, and she "just heard bits and pieces of it[.]" T.W. testified that she believed M.W., T.W. was hurt and angry and that what she heard "changed everything[,]" and that Haggard was "like a brother to [her]." T.W. testified that that evening they left for her niece's birthday party because plans had already been made and she did not know yet how to handle the news of the assault. Before they left for the party, M.W. showered and

5

T.W. had M.W. put the clothes she had worn at Haggard's house in a "zip lock bag[]" because "[M.W.] had said that there was stuff on the clothing[.]" According to T.W., L.B. picked M.W. up from school the next morning and took her to the hospital because T.W. could not leave work then, but T.W. met them there later after she had arranged with her boss for her to leave work. Hospital personnel notified law enforcement and T.W. provided law enforcement with her written statement.

L.B. testified that she previously had been married to T.W's brother, and after the divorce, L.B. remained friends with T.W. L.B. testified that she had known M.W. since M.W.'s birth, and that M.W. referred to her as her "aunt[.]" According to L.B., on October 6, 2013, she had a phone call conversation with M.W.'s mother and initially L.B. was going to go and see M.W. once M.W.'s mother picked M.W. up from Haggard's house, but the plans changed and L.B. picked M.W. up from Haggard's house. L.B. explained that she had been to Haggard's house "probably seven or eight times[]" before and that when she picked up M.W., M.W. stepped out on the porch as L.B. pulled up and then L.B. walked into Haggard's house. L.B. testified that she was at Haggard's house for approximately four or five minutes, she spoke to Haggard, and that his demeanor "seemed normal."

According to L.B., she picked up M.W. and A.W and that on the way to M.W.'s house M.W. seemed quieter than usual. L.B. testified that M.W. recited the

6

events of what had taken place at Haggard's house several times to her and M.W.'s mother, and that although the basis of the account did not change, the account became more detailed. L.B. testified that she saw a mark on M.W.'s breast that was consistent with her having been assaulted. After several hours, L.B. left to allow M.W.'s parents to decide how to proceed. L.B. testified that M.W.'s mother was struggling with how to proceed because of the potentially "devastating" impact to the family and she was "really scared, really upset, really lost." L.B. explained that at the time of the incident she worked in a sex offender rehabilitation program in the prison, that she called a rape crisis center to get information on what she should do because she felt like M.W. needed to go to a doctor and be examined, and that later that day she called T.W. and told her she was going to pick up M.W. and take her to the hospital, that M.W.'s mother was agreeable to that, and L.B. took M.W. to the hospital. According to L.B., M.W. was nervous and scared on the way to the hospital and that "[s]he cried quite a bit that day." L.B. testified that she gave the clothes that M.W. had been wearing on the day of the assault in a plastic bag to hospital personnel. M.W.'s mother arrived at the hospital later.

Suzanne Devore, a sexual assault nurse examiner (SANE) employed by Memorial Hermann Hospital on October 7, 2013, testified that she performed a sexual assault exam on M.W. According to the SANE's report, M.W. was brought

in by her aunt, L.B., and that M.W. reported being sexually assaulted on October 5, 2013. The SANE testified that, according to her report, M.W. stated the following to her just prior to the exam:

> I was in my uncle's, James Haggard, house on Saturday and he pulled me back to his bedroom. He's my uncle, and I didn't think he would do anything perverted.
> He told me to take off my shirt. I told him I felt uncomfortable. He wasn't forcing me, but he took my bottoms off and started playing with my boobs with his fingers and started licking them.
> On my right boob I have a hickey. . . .
>
> . . . .
>
> He went down on me, his mouth inside and outside my vagina, and then started doing the dirty deed, his penis inside my vagina[.]
> He heard someone walking down the hall and said, "Hurry up and put on your clothes." He kept saying [] I better not tell because he would lose his baby and if anyone found out he would go to jail.
>
> . . . .
>
> He said, "You better not tell your mom." I had an hour of sleep. I woke up, called my mom, and told her to come get me. She asked if he had tried to touch me; and I said yes, he did.
> My mom asked me because my sister who is six doesn't want to go over there anymore, and my mom thinks my uncle's boy who is 10 touched me.

After the sexual assault exam of M.W., the SANE noted in her report that there was no trauma to M.W.'s sexual organs, but that M.W. had a bruise on her right breast that the SANE believed was recent based on its coloring. The sexual

8

assault exam report and photographs of M.W.'s bruise taken the day of the exam were admitted into evidence.

Detective Stephen Clappart, the chief investigator for the Harris County District Attorney's Office, testified that he observed via closed circuit television the forensic interview of M.W. at Bridgehaven. Detective Clappart testified that he noted in his report that the account of events that M.W. gave to the SANE examiner was slightly different from what she gave to the Bridgehaven examiner in that she reported to one of the examiners that Haggard had pulled her into the bedroom but she did not report that to the other examiner. According to Detective Clappart, he obtained buccal swabs from Haggard.

Jessica Lake, a forensic scientist at the Texas Department of Public Safety crime lab, testified that she performed serology testing on evidence she had received for the case. According to Lake, M.W.'s vaginal and anal swabs from the sexual assault kit tested negative for the presence of semen and sperm, and that panties, bra, a sports bra, and a shirt allegedly worn by M.W. on the day of the alleged sexual assault also tested negative for the presence of semen. Lake's Forensic Biology Laboratory Report was admitted into evidence.

Andrea Smith, a forensic scientist with the Texas Department of Public Safety crime laboratory, testified that she works on the same team as Lake and completed

9

DNA testing in the case. Smith testified that the DNA profile from the vaginal swab was consistent with M.W. Smith tested the swab of M.W.'s right breast and concluded that M.W. and Haggard could not be excluded as contributors to the profile. According to Smith, under DNA Minifiler testing of the swab of M.W.'s right breast, the DNA profile "is 339 billion times more likely if the DNA came from [M.W.] and James Haggard than if the DNA came from [M.W.] and one unrelated unknown individual." Smith testified that using newer and more advanced testing with STRmix probabilistic genotyping software, the profile obtained from the swab is "219 quadrillion times more likely if the DNA came from [M.W.] and James Haggard than if the DNA came from [M.W.] and one unrelated unknown individual." Smith's DNA Laboratory Report, Supplemental DNA Laboratory Report, and Minifiler Laboratory Report were admitted into evidence.

Testimony via Facebook Live[3]

In issue one, Haggard argues the trial court erred in permitting the SANE to testify, over Haggard's objection, via "Facebook Live" and that he was harmed by

---

[3] On appeal, Appellant refers to the live two-way video streaming capability as "Facebook Live[,]" but the trial record reflects that the application used for the SANE's testimony was "FaceTime[,]" which is "an application that allows individuals to make video calls from telephones[,]" and "FaceTime may also be run from other electronic devices." *Perone v. State*, No. 14-12-00969-CV, 2014 Tex. App. LEXIS 4078, at *6 (Tex. App.—Houston [14th Dist.] Apr. 15, 2014, no pet.) (mem. op., not designated for publication) (footnotes omitted).

10

such error. The central purpose of the Sixth Amendment's Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in an adversarial proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Accordingly, "'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial[.]'" *Id.* at 849 (emphasis in original) (quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). In the absence of an actual face-to-face confrontation, a defendant's right to confront accusatory witnesses may be satisfied if (1) denial of such confrontation is necessary to further an important public policy and (2) the reliability of the testimony is otherwise assured. *Id.* at 850.

After voir dire but prior to the presentation of evidence, the State made an oral motion to allow the SANE, as an expert and a fact witness to the extent of what the sexual assault examination entailed and evidence she gathered incident to the examination, to testify via "Face Time." The defense objected under the Sixth Amendment confrontation clause and the Fifth Amendment due process clause, and cited *Maryland v. Craig*, and *U.S. v. Yates*, 438 F.3d 1307 (11th Cir. 2006) in support. The trial court went over the FaceTime procedure on the record. The trial court confirmed that the SANE would be displayed "at least on the 60 or 65-inch TV that the jury can view[,]" defense counsel and the defendant could see the testimony,

11

the jury would have view of the SANE's face at all times during her testimony, the SANE could see the person asking questions, and that the SANE would be given instructions to "stay[] in front of the camera system . . . which is whatever her device is[.]"

Prior to the trial court overruling the objection, the trial court, State's counsel, and Haggard's counsel engaged in the following discussion:

> THE COURT: Well, I think [*Maryland v. Craig*] was a situation where they put the witness behind a screen and asked questions of the witness.
>
> We're not talking -- I mean that way the jury would be deprived of viewing the witness' demeanor or expressions and other indicia of the reliability or lack of reliability that a face to face confrontation would otherwise supply.
>
> It's the court's understanding that the Sixth Amendment confrontation clause is designed to ensure the reliability of the evidence that's actually received, and the reliability of that evidence has to be testified through rigorous cross examination.
>
> It's the court's opinion that anything that would have the chilling effect on the right of cross examination would by its very nature be suspect but --
>
> . . . .
>
> [Defense Counsel]: That case, Maryland versus Craig came up with the Craig ruling; and then you have Yates in 2006. The reason in Yates, the Australian witnesses could not testify in Alabama is they were unwilling to travel.
>
> The government asserted that the important public policy reasons for allowing them to testify utilizing two-way video conference for providing the fact-finder with crucial evidence expeditiously and justly resolving the case in ensuring that foreign witnesses can so testify.

12

The 11th Circuit held that these concerns were not the type of public policies that are important enough to outweigh the defendant's rights to confront their accusers face to face.

My understanding of the Maryland versus Craig, what came out of that, Judge, was that -- let's see.

THE COURT: Counsel, I don't mean to interrupt; but I think what's crucial to a determination of the state's request is the function that this witness is going to provide in the case.

Now, if we're talking about a witness that is a fact witness to the point that that witness will be called upon to make an identification of the defendant as the alleged perpetrator cross examination face to face I think is crucial; but here we're talking about an expert witness that is not going to be called upon to make any in-court identification or is not going to be called upon to testify to any of the factual allegations contained in the indictment.

[Defense Counsel]: Judge, I don't think the Supreme Court differentiates between a state's witness. They have the power to subpoena a witness or have them come.

She has chosen not to come. There is no public policy that alleviates what -- I believe even the 9th Circuit says they should be able to have confrontation face to face. In doing so you will set a precedent not only in this court but all over, Judge.

The only time I have seen them allow someone not to be present is because of some type of medical issue or maybe they are out of Country or something to that or in the military or something to that effect, but just because they don't want to come --

THE COURT: I agree with you, counsel; but those were witnesses as to the operative facts of the case. They were not a witness situated such as this witness and that is as an expert witness.

Now, who is this witness associated with at the time? A hospital?

[Prosecutor]: Yes, sir. I believe it was part of the Hermann Hospital group.

13

THE COURT: [T]here is a procedure available to secure the presence of out of state witnesses.

Now, you represented to the court that at all times this witness indicated her willingness to accept reimbursement of compensation for travel expenses and would actually appear in person; is that true?

[Prosecutor]: That is true. I have [someone] that has been in direct contact with her that can testify to that.

THE COURT: When did this change?

[Prosecutor]: Friday.

THE COURT: Friday being --

[Prosecutor]: Three days ago.

THE COURT: The 11th, and today is August 14th. Obviously[,] you don't have time to secure an order from the appropriate court in Montana to direct the witness to do anything.

[Prosecutor]: Judge, it was 2:00 o'clock in the afternoon, between 1:00 and 2:00 when we even found out about it, Judge.

THE COURT: Well, the best authority in Texas is [*Stevens v. State*, 234 S.W.3d 748 (Tex. App.—Fort Worth 2007, no pet.).] [I]t found that the decision of the court to allow or not to allow should be examined on an abuse of discretion standard.

This again constituted a fact witness that appeared by Skype or some other device similar to what is being proposed here. It went on to note the salutary effects of face to face confrontation include the giving of testimony under oath.

I'm assured this will occur in this particular case. We won't allow any testimony not to be under oath by a person authorized to administer oaths. [Also], [t]he opportunity for cross examination.

The court concludes the manner in which it's being proposed will not have a chilling effect on the right of cross examination, the ability of the fact-finder to observe demeanor evidence -- and you assure me

14

that the witness will be instructed to stay in front of a TV that will be broadcast on a 60 to 65-inch TV for the jury's consideration -- the reduced risk that a witness will wrongfully implicate an innocent defendant when testifying in his presence.

That is not an element in this case because this witness is an expert witness and will be testifying only to perhaps her training and then what she did incident to her sexual assault examination, right?

[Prosecutor]: That's correct.

. . . .

[Prosecutor]: She collected the SANE kit and submitted the SANE kit to the sheriff's department to put in the chain of custody to send it to the DPS lab along with everything else.

. . . .

[Defense Counsel]: Again, Judge, my belief is that this can only happen with exceptional circumstances that outweigh or public policy that outweighs my client's constitutional rights to confront the witness face to face here in the courtroom.

THE COURT: [I]f this is anything other than an expert witness I think I would have to agree with you. I think the Texas cases also recognize that exceptional circumstances must exist to allow.

. . . .

THE COURT: . . . . If [Defense counsel] wants to recall her in his case in chief, then he cannot be deprived of that opportunity. . . .

. . . .

THE COURT: . . . . Assuming that the manner in which this testimony will be presented is exactly as represented to the court, that counsel will have a full opportunity to observe the witness, the witness will be able to see the questioner be it the state or the defense counsel, that the

15

witness will at all times be in full view for the jury's consideration as to demeanor, etc., and that the witness has no personal knowledge of any facts as alleged in the indictment and only testify as an expert witness as far as being a SANE examiner and what she did incident to that examination in identifying anything that she retrieved from the examination, the court is going to allow the testimony in that manner.

Haggard objected again when the State called the SANE to testify, arguing it violated due process as contained in the Sixth Amendment right to confrontation, and the trial court overruled the objection. The trial court further noted that cross-examination would be available, the witness was in full view, and that that witness was an expert witness and not a fact witness for identification purposes. The SANE testified that she chose to not appear at trial, had no medical issue preventing her from appearing at the trial, and she was not subpoenaed. According to the SANE, she is a consultant for hospitals and attorneys, and she chose not to attend the trial for personal and economic reasons because she had travelled to Houston the prior week to testify in another trial and had to travel back to Houston soon to be with a family member in hospice care. The SANE explained that she had agreed to appear and testify and the State did not subpoena her, but the Friday before the trial she changed her mind.

On appeal, Haggard contends that as to the SANE's testimony via live videoconference "there was no important public interest for her to do so, nor was the reliability of her testimony assured to override Appellant's right to confront her[,]"

16

and that the testimony contributed to Haggard's convictions. According to Haggard, (1) the SANE's failure to appear was voluntary and the State did not issue a subpoena, (2) the SANE was given an oath in Montana by a notary public and not by the clerk of the court or judge in Liberty County, (3) the record does not reflect that Haggard was moved so that the SANE could see him or that the trial court instructed the SANE be able to see Haggard, and (4) the jury's ability to observe the SANE's demeanor was impaired when the live videoconference connection was lost momentarily as the SANE recited what M.W. had reported to her.

Even assuming without deciding that the trial court abused its discretion in allowing the SANE's testimony, the violation of the Sixth Amendment right of confrontation constitutes constitutional error that is subject to a harmless error analysis. *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

When assessing harm under a Confrontation Clause issue, we apply a three-pronged test. *Id*. at 547. First, we assume that the damaging potential of the cross-examination was fully realized. *Id.* Second, with that assumption in mind, we review the error by considering the following factors: the importance of the witness's testimony in the State's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting material points of the

17

witness's testimony, the extent cross-examination was otherwise permitted, and the overall strength of the State's case. *Id.* Third, we determine whether the error was harmless beyond a reasonable doubt. *Id.*

The SANE was an expert witness who testified about what M.W. reported to her, the findings from her examination of M.W., and the chain of custody regarding evidence the SANE obtained. After reviewing the entire record, we conclude that much of the SANE's testimony was cumulative of M.W.'s testimony, and the SANE was not a crucial identification or fact witness. The record demonstrates that the trial court permitted Haggard to fully cross-examine the SANE. There was evidence introduced from M.W., L.B., and T.W., as well as from the forensic witnesses that corroborated the material points of the SANE's testimony, and the State's case was not dependent upon the SANE's testimony.

M.W.'s testimony alone is sufficient to support Haggard's convictions. *See* Tex. Code Crim. Proc. Ann. art. 38.07(b)(1) (West Supp. 2018); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978) (sexual assault of a child); *Jones v. State*, 428 S.W.3d 163, 169-70 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (indecency with a child). M.W. testified that on October 5, 2013, when she was fifteen years old, she got in Haggard's bed with him because she did not want to sleep on the floor, he showed her pornography, he asked her to take her clothes off, he caused

her sexual organ to contact or penetrate his mouth, he contacted or penetrated her sexual organ without her consent, he penetrated her sex organ with his finger, he caused her to contact his sex organ, he touched her breast with a part of his body, he touched her genital with a part of his body, he caused her to touch his genitals, and he caused her to expose her genitals to him. M.W. testified that Haggard's actions were done to make him sexually aroused. Also, the jury heard the testimony of a forensic scientist that the profile obtained from the swab from M.W.'s breast is "219 quadrillion times more likely if the DNA came from [M.W.] and James Haggard than if the DNA came from [M.W.] and one unrelated unknown individual." Because our review of the record shows that the properly admitted evidence overwhelmingly established Haggard's guilt, we conclude, beyond a reasonable doubt, that the admission of the SANE's testimony via live videoconferencing did not contribute to Haggard's convictions. We overrule issue one.

"T's" Presence During M.W.'s Testimony

In issue two, Haggard argues that the trial court erred in allowing "T" to stand behind nineteen-year-old M.W. during her testimony. According to Haggard, M.W. was an adult at the time of trial and the trial court made no findings pursuant to article 38.074 of the Texas Code of Criminal Procedure. Prior to M.W.'s testimony, the following exchange occurred outside of the jury's presence:

19

[Prosecutor]: Judge, pursuant to the code [M.W.]'s requesting that she be allowed a support person to stand in the courtroom with her. She was a child victim.

Although she's an adult now she would like to have T[] stand behind her.

THE COURT: It will be permitted. All right. We're going to bring the jury in. If you will just stand where you are. In a moment I will ask your name and swear you in.

Section 3(b) of article 38.074, titled "Testimony of Child in Prosecution of Offense[,]" provides that

"[o]n the motion of any party . . ., the court shall allow the child to have a toy, blanket, or similar comforting item in the child's possession while testifying or allow a support person to be present in close proximity to the child during the child's testimony if the court finds by a preponderance of the evidence that: (1) the child cannot reliably testify without the possession of the item or presence of the support person, as applicable; and (2) granting the motion is not likely to prejudice the trier of fact in evaluating the child's testimony."

Tex. Code Crim. Proc. Ann. art. 38.074, § 3(b) (West Supp. 2018). Section 1(2) provides that a "'[s]upport person' means any person whose presence would contribute to the welfare and well-being of a child." *Id.* § 1(2). Section 1(1) states that in Article 38.074 "child" has the meaning assigned by section 22.011(c) of the Penal Code, which defines "child" as "a person younger than 17 years of age." *Id.* § 1(1); Tex. Penal Code Ann. 22.011(c)(1). Section 3(d) provides that the "court may set any other conditions and limitations on the taking of the testimony of a child that it finds just and appropriate, considering the interests of the child, the rights of

20

the defendant, and any other relevant factors." Tex. Code Crim. Proc. Ann. art. 38.074, § 3(d). "A support person who is present during a child's testimony may not: (1) obscure the child from the view of the defendant or the trier of fact; (2) provide the child with an answer to any question asked of the child; or (3) assist or influence the testimony of the child." *Id.* § 3(c).

Haggard's counsel did not object to "T's" presence nor did Haggard's counsel request findings pursuant to article 38.074, section 3(b). Accordingly, his complaint about "T's" presence during M.W.'s testimony is not preserved for appellate review. *See* Tex. R. App. P. 33.1(a) (preserving error for appellate review requires the complaining party to show that he presented his complaint to the trial court in a timely request, objection, or motion and that the trial court ruled on the request). We overrule issue two.

Ineffective Assistance of Trial Counsel

In issue three, Haggard claims his trial counsel was ineffective for not objecting to opinion testimony as to M.W.'s credibility and in not objecting to "T's" presence behind M.W. during her testimony. Haggard argues these errors deprived him of a fair trial.

A defendant has a Sixth Amendment right to the effective assistance of counsel at trial. U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668,

21

685-86 (1984). To establish that he received ineffective assistance of counsel, Haggard must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687-88, 694. The party alleging ineffective assistance has the burden to develop facts and details necessary to support the claim. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). A party asserting an ineffective-assistance claim must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 689). An appellant's failure to make either of the required showings of deficient performance or sufficient prejudice defeats the claim of ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

The right to effective assistance of counsel ensures the right to "reasonably effective assistance[,]" and it does not require that counsel must be perfect or that the representation must be errorless. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). The appropriate context is the totality of the representation;

22

counsel is not to be judged on isolated portions of his representation. *See Thompson*, 9 S.W.3d at 813; *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990). Isolated failures to object to improper evidence or argument ordinarily do not constitute ineffective assistance of counsel. *See Ingham*, 679 S.W.2d at 509; *Ewing v. State*, 549 S.W.2d 392, 395 (Tex. Crim. App. 1977). To meet his burden regarding his claim that his counsel was ineffective for failing to object to evidence, Appellant must also establish that the trial court would have committed error in overruling such objection had an objection been made. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996).

Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial to demonstrate in the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012). Before we denounce trial counsel's actions as ineffective, counsel should normally be given an opportunity to explain the challenged actions. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). When counsel has not been given an opportunity to explain the challenged actions, we will only find deficient performance if the conduct was "'so outrageous that no competent attorney would have engaged in it.'" *Id.* (internal citations omitted).

Haggard asserts that trial counsel was deficient in failing to object to the State's questioning of T.W. regarding whether she believed what M.W. told her about the incident. According to Haggard, there is no objectively reasonable reason for not objecting to the question as the testimony decides a critical issue for the jury, the credibility and truthfulness of the complainant, and that the trial court would have erred if it had overruled the objection had counsel objected. Haggard also argues that an objectively reasonable trial attorney would have objected to M.W. having a support person ("T") present during M.W.'s testimony because section 38.074 of the Texas Code of Criminal Procedure does not permit a person testifying at age nineteen to have a support person present during her testimony. As to both instances, Haggard argues that the jury used the evidence as proof of Haggard's guilt or to find M.W.'s testimony more credible, and therefore, there is a reasonable probability that, but for these deficiencies, the result of the trial would have been different.

As to trial counsel's failure to object to the State's questioning of T.W. regarding whether she believed M.W.'s account of the incident, counsel's trial strategy could have been to permit the State to predicate its case on M.W.'s credibility and then undermine M.W.'s credibility by cross-examining M.W., T.W., and L.B. regarding the details given by M.W. in her accounts of the incident. The

24

record before us does not support Haggard's contention that no reasonable trial strategy could have existed for his counsel's failure to object to the questioning of T.W. regarding whether she believed M.W. Based on the record before us, Haggard has failed to overcome the "strong presumption" that his trial counsel provided reasonably professional assistance by not objecting to this question by the State. *See Thompson*, 9 S.W.3d at 813 (citing *Strickland*, 466 U.S. at 689). Furthermore, Haggard has failed to show that there is a reasonable probability that, but for counsel's failure to object to the State's question, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. The jury heard M.W.'s own testimony, saw photographs of M.W. after the incident, and heard testimony by a forensic scientist of the likelihood that Haggard was a contributor to the DNA swab of M.W.'s right breast. A reasonable jury could have found Haggard guilty even if it had not heard T.W.'s testimony that she believed M.W.

Even assuming without deciding that the trial court would have sustained an objection by Haggard's trial counsel to "T's" presence during M.W.'s testimony and that "T's" presence was error, Haggard has not met his burden to demonstrate that the result would have been different if the presence of "T" as a "support person" had not been allowed. *See id.* at 687-88, 694. Haggard does not argue that "T" in any way influenced M.W.'s testimony, and Haggard's claim that the jury found M.W.

25

more credible due to the presence of "T" is purely speculative. We overrule issue three.

Jury Charge Error

In issues four and five, Haggard contends the trial court erred because the jury charge in each count allowed for a non-unanimous verdict and, as a result, Haggard suffered egregious harm.

As to Count I, Haggard asserts the State's indictment alleged four separate and distinct offenses, the jury was not instructed that it cannot return a guilty verdict unless it unanimously agrees upon the commission of any one of the criminal acts, and the unanimity requirement is undercut when a jury risks convicting the defendant of different acts instead of agreeing on the same act for a conviction. The jury charge verdict form for Count I asked the jury to find Haggard guilty or not guilty of "the felony offense of Sexual Assault of a Child as charged in Count I of the indictment." The application paragraph of the jury charge as to Count I stated the following:

> You must decide whether the State has proved, beyond a reasonable doubt, four elements. The elements are that:
> 1. On or about the 5th day of October, 2013, in Liberty County, Texas;
> 2. The defendant . . . did then and there[] intentionally or knowingly;
> 3. Cause:

26

a. The sexual organ of [M.W.] to contact or penetrate the mouth of the defendant, and/or

b. The sexual organ of [M.W.] to contact or penetrate the sexual organ of the defendant, and/or

c. The penetration of the sexual organ of [M.W.] by defendant's finger, and/or

d. The penetration of the sexual organ of [M.W.] by defendant's sexual organ;

4. Without the consent of [M.W.], a child younger than 17 years of age and not the spouse of the defendant.

You must all agree on elements 1, 2, 3, and 4 listed above.

If you all agree the State has proved each of the four elements listed above, beyond a reasonable doubt, you must find the defendant "guilty."

If you all agree the State has failed to prove, beyond a reasonable doubt, one or more of elements 1, 2, 3, or 4 listed above you must find the defendant "not guilty."

Haggard argues that the jury charge as to the sexual assault charge was infirm because the indictment sought to convict Haggard of sexual assault of a child in one conviction by proving any of the two offenses alleged within one count, the trial court instructed the jury in the application paragraph that they could find Haggard guilty if they believed either of the two offenses, and that the unanimity requirement is undercut when a jury risks convicting the defendant of different acts instead of agreeing on the same act for a conviction.

As to Count II, the jury charge verdict form asked the jury to find Haggard guilty or not guilty of "the felony offense of Indecency with a Child by Sexual

Contact as charged in Count II of the indictment." The application paragraph of the jury charge as to Count II stated the following:

> You must decide whether the State has proved, beyond a reasonable doubt, four elements. The elements are that:
> 1. On or about the 5th day of October, 2013, in Liberty County, Texas;
> 2. The defendant . . . did then and there[] with the intent to arouse or gratify the sexual desire of said defendant;
> 3. Engage in sexual contact with [M.W.] by:
>    a. Touching the breast of [M.W.], and/or
>    b. Touching the genitals of [M.W.], and/or
>    c. Causing the said [M.W.] to touch the genitals of the defendant, and/or
>    d. Causing [M.W.] to expose her genitals;
> 4. [M.W.] was a child younger than 17 years of age and not the spouse of the defendant.
>
> You must all agree on elements 1, 2, 3, and 4 listed above.
>
> If you all agree the State has proved each of the four elements listed above, beyond a reasonable doubt, you must find the defendant "guilty."
>
> If you all agree the State has failed to prove, beyond a reasonable doubt, one or more of elements 1, 2, 3, or 4 listed above you must find the defendant "not guilty."

Under Texas law, jury unanimity is required in all criminal cases. *Jourdan v. State*, 428 S.W.3d 86, 94 (Tex. Crim. App. 2014). A jury must reach a unanimous verdict about a specific felony that the defendant committed, meaning the jury must agree upon "a single and discrete incident that would constitute the commission of the offense alleged." *See Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011) (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex. Crim. App. 2007)).

28

While jury unanimity generally is not required on the alternate modes or means of commission, the jurors must all agree "that the defendant committed the same, single, specific criminal act." *See Jourdan*, 428 S.W.3d at 94; *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005).

A defendant may choose to require the State to elect a specific criminal act that it relies upon for conviction. *See Cosio*, 353 S.W.3d at 775. Even if the defendant does not require an election, "guaranteeing unanimity is ultimately the responsibility of the trial judge[,]" and "[t]he trial judge is therefore obligated to submit a charge that does not allow for the possibility of a non-unanimous verdict." *Id.* at 776.

Haggard argues that the jury could have relied on separate acts of criminal conduct, which constituted different offenses or separate units of prosecution, and the jury instructions in the application paragraph for Count I and Count II that the jurors must all agree that the State has proved each of the four elements beyond a reasonable doubt did not rectify the error.

That said, Haggard also concedes that for both Counts I and II his trial counsel did not object to the charge and did not request the State to make an election as to which acts they were proceeding on for conviction. Reversal for an unobjected-to erroneous jury instruction is proper only if the error caused actual, egregious harm

29

to the appellant, not merely theoretical harm. *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Actual egregious harm is established if the jury charge affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Arrington*, 451 S.W.3d at 840; *Almanza*, 686 S.W.2d at 172. This analysis is fact-specific and is done on a case-by-case basis. *Arrington*, 451 S.W.3d at 840 (citing *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013)). When assessing harm based on the particular facts of the case, we consider (1) the entire jury charge, (2) the state of the evidence, including contested issues and the weight of the probative evidence, (3) the parties' arguments, and (4) all other relevant information in the record. *See id.* (citing *Almanza*, 686 S.W.2d at 171). An appellate court will "inquire about the likelihood that the jury would in fact have reached a non-unanimous verdict on the facts of the particular case." *Jourdan*, 428 S.W.3d at 98.

Assuming without deciding that the jury charge permitted non-unanimous verdicts on the evidence presented in the case, neither the parties nor the trial judge compounded the alleged error by telling the jury that it did not have to be unanimous regarding the specific instances of criminal conduct in rendering its verdicts. The record indicates that M.W. testified that during the incident Haggard committed all

30

the separate acts of criminal conduct alleged in the application paragraphs for Counts I and II and as alleged in the indictment, and Haggard's defense was that M.W. was not credible. The jury was not persuaded that he did not commit the offenses or that there was any reasonable doubt. On this record, it is logical to infer that the jury unanimously agreed that Haggard committed all the separate instances of criminal conduct alleged in Counts I and II during the incident. *See Cosio*, 353 S.W.3d at 777-78. We conclude that the Appellant has failed to demonstrate that any error regarding unanimity caused actual egregious harm to Appellant. *See Arrington*, 451 S.W.3d at 845. We overrule issues four and five.

Punishment

In issue six, Haggard argues his punishment in Count II is void. Specifically, Haggard asserts that his twenty-five-year sentence for indecency with a child exceeds the maximum allowed by the Legislature. Despite Haggard's contention on appeal otherwise, the jury charge for Count II tasked the jury with finding Haggard not guilty or guilty of the felony offense of Indecency with a Child by Sexual Contact as charged in Count II of the indictment but did not task the jury to find Haggard not guilty or guilty of the offense of Indecency with a Child by Exposure. Haggard did not object to the jury charge. As to Count II, the jury found Haggard guilty of indecency with a child by contact. Haggard stipulated that he was the same person

convicted in the punishment enhancement allegations, and the trial court assessed punishment at twenty-five years in prison to run consecutively with the sentence in Count I. The twenty-five-year sentence was within the statutory range. *See* Tex. Penal Code Ann. §§ 12.32 (West 2019) (first-degree-felony punishment range is imprisonment for life or for any term not more than 99 years or less than 5 years), 12.42(b) (West 2019) (enhancement of second-degree felony to first-degree felony if defendant has previous felony conviction), 21.11(d) (offense of indecency with a child by contact is a second-degree felony). We overrule issue six.

## Sufficiency of the Evidence

In issue seven, Haggard challenges the sufficiency of the evidence supporting the convictions in Count I and Count II. According to Haggard, M.W.'s testimony was not credible, and she was impeached with prior statements as to the details of the alleged offenses.

In reviewing the legal sufficiency of the evidence to determine whether the State proved the elements of the offense beyond a reasonable doubt, we apply the *Jackson v. Virginia* standard. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under that standard, a reviewing court must consider all the evidence in the light most favorable to the verdict and determine whether a rational justification exists for the jury's

32

finding of guilt beyond a reasonable doubt. *Id.* at 902; *see also Jackson*, 443 U.S. at 319. "A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). As the trier of fact, the jury is the sole judge of the weight and credibility of the witnesses' testimony, and on appeal we must give deference to the jury's determinations. *Brooks*, 323 S.W.3d at 899, 905-06. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Id.* at 899 n.13 (citing *Jackson*, 443 U.S. at 326). On appeal, we serve only to ensure the jury reached a rational verdict, and we may not substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In our review, we consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). In indecency and sexual assault cases involving a child, the testimony of a child victim alone is sufficient to support a conviction. *See* Tex. Code Crim. Proc. Ann. art. 38.07(b)(1); *Garcia*, 563 S.W.2d at 928 (sexual assault of a child); *Jones*, 428 S.W.3d at 169-70 (indecency with a child). The State has no burden to produce any corroborating or physical evidence. *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no

33

pet.). The appellate court views the sufficiency of the evidence against a hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

A person commits the offense of sexual assault of a child if the person knowingly (1) causes the penetration of the anus or sexual organ of a child by any means; (2) causes the penetration of the mouth of a child by the sexual organ of the actor; (3) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; (4) causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or (5) causes the mouth of a child to contact the anus or sexual organ of another person, including the actor. *See* Tex. Penal Code Ann. § 22.011(a)(2). "'Child'" means a person younger than 17 years of age." *Id.* § 22.011(c)(1).

To establish the offense of indecency with a child by contact, the State had to prove that Appellant engaged in sexual contact with M.W., a child younger than seventeen years of age. *See* Tex. Penal Code Ann. § 21.11(a)(1). Section 21.11's definition of "sexual contact" includes acts, if committed with the intent to arouse or gratify the sexual desire of any person, of "any touching by a person, including touching through clothing, of the . . . breast . . . of a child[.]" *See id.* § 21.11(c)(1).

M.W. testified that on October 5, 2013, when she was fifteen years old, Haggard caused her sexual organ to contact or penetrate his mouth, he contacted or penetrated her sexual organ without her consent, he penetrated her sex organ with his finger, he caused her to contact his sex organ, he touched her breast with a part of his body, he touched her genitals with a part of his body, he caused her to touch his genitals, and he caused her to expose her genitals to him. M.W. testified that Haggard's actions were done to make him sexually aroused. M.W.'s testimony alone was sufficient to support the convictions. *See* Tex. Code Crim. Proc. Ann. art. 38.07(b)(1); *Garcia*, 563 S.W.2d at 928 (sexual assault of a child); *Jones*, 428 S.W.3d at 169-70 (indecency with a child). The jury also heard Smith's expert testimony that using newer and more advanced testing with STRmix probabilistic genotyping software, the profile obtained from the swab from M.W.'s breast is "219 quadrillion times more likely if the DNA came from [M.W.] and James Haggard than if the DNA came from [M.W.] and one unrelated unknown individual."

Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the charged offenses beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. The jury was the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given their testimony, and could have found M.W.'s testimony, as well as testimony

35

of other witnesses credible and resolved any conflicting evidence in favor of the verdict. *See id.*; *Brooks*, 323 S.W.3d at 899; *see also* Tex. Code Crim. Proc. Ann. art. 38.07. We overrule Haggard's challenge to the legal sufficiency of the evidence. Having overruled all of Haggard's appellate issues, we affirm the trial court's judgments.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on April 17, 2019
Opinion Delivered May 29, 2019
Do Not Publish

Before Kreger, Horton and Johnson, JJ.